FILED
NOV 04 2011

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JANET LUNDQUIST, | * | CIV 09-4147-RAL |
| | * | |
| Plaintiff, | * | |
| | * | OPINION AND ORDER |
| vs. | * | GRANTING DEFENDANT'S |
| | * | MOTION FOR SUMMARY |
| UNIVERSITY OF SOUTH DAKOTA | * | JUDGMENT |
| SANFORD SCHOOL OF MEDICINE, | * | |
| | * | |
| Defendant. | * | |

Plaintiff Janet Lundquist sued Defendant University of South Dakota Sanford School of Medicine ("USD Sanford School of Medicine") claiming a violation of the Americans with Disability Act ("ADA"), 42 U.S.C. § 12112 et. seq. After both parties concluded discovery, USD Sanford School of Medicine filed a Motion for Summary Judgment (Doc. 16). This Court held a hearing on all pending motions on October 7, 2011. For the reasons explained, this Court grants Defendant's Motion for Summary Judgment.

## I. Material Facts in Light Most Favorable to Lundquist

Lundquist began working for USD Sanford School of Medicine at its Center for Disabilities in February of 2004, in a half-time position as a staff assistant. (Doc. 24[1] at p.1, ¶ 1). Lundquist worked from 12:30 p.m. until 4:30 p.m., Monday through Friday. (Id. at p.1, ¶ 2). In February of 2007, Lundquist was promoted to the position of secretary, but she continued to work half time with the same hours. (Id. at p.1, ¶ 3). USD Sanford School of Medicine has an office for its Center for Disabilities at the Wagner Health Science Center ("Wagner Center") on the campus of Sanford Hospital in Sioux Falls, South Dakota. (Id. at p.1,

---

[1] Under Local Rule 56.1, Defendant USD Sanford School of Medicine filed a Statement of Undisputed Material Facts. (Doc. 18). Lundquist appropriately responded by filing Plaintiff's Statement of Undisputed and Disputed Facts in Opposition to Summary Judgment. (Doc. 24). This Court takes the facts in the light most favorable to Lundquist, as the non-moving party, and draws the facts primarily from the Plaintiff's Statement of Undisputed and Disputed Facts in Opposition to Summary Judgment. (Doc. 24). Because Lundquist's pleading has two separate parts where paragraphs are numbered, this Court cites to both the page number and the paragraph number of that pleading.

¶ 4). The parking lot adjacent to the Wagner Center is owned and maintained by Sanford Health. (Id. at p.4-5, ¶ 4).

Lundquist is a person with disabilities, both physical and mental in nature. (Id. at p.8, ¶ 3). Throughout her employment at USD Sanford School of Medicine, Lundquist was on social security disability insurance due to her disabilities. (Id. at p.9, ¶ 5). USD Sanford School of Medicine had some information about Lundquist's disabilities and had accommodated her within the office by allowing her to take flex time, providing a special keyboard and writing device, giving her mental health days, and allowing her to work from home when necessary. (Id. at p.9, ¶ 6). Lundquist has difficulty walking and at times uses a cane. She has a vehicle with disability license plates and a handicap-reserved parking permit issued by the state of South Dakota. (Id. at p.2, ¶ 5).

In the Fall of 2007, Danny Garaets, the building resources manager for the Wagner Center, sent an email to USD Sanford School of Medicine staff, including to Lundquist, concerning employee parking. Garaets wrote that Sanford Health had allocated parking spots to employees of the Wagner Center in the parking ramp and that employee parking also was available across from a local church. Garaets also wrote that the lot adjacent to the Wagner Center was for patient parking only. (Id. at p.2, ¶ 6). Lundquist responded to Garaets on November 28, 2007, expressing concerns about cross-walk accessibility for employees parking near the local church and about the number of parking spots available to patients and employees working at the Wagner Center. (Id. at p.2, ¶ 7).

On January 23, 2008, Lundquist contacted Judy Struck, an executive director and fellow employee at the Wagner Center who likewise had ambulatory difficulties. Lundquist told Struck that Lundquist had been unable to find an open handicap-accessible parking space, because other vehicles were inadvertently parked in those spaces due to snow cover. Struck instructed Lundquist to park in one of the 15-minute parking spots. (Id. at p.2, ¶ 8). Lundquist did so on January 23 and again on February 20, 2008, with Struck's approval. (Id. at p.2, ¶ 9). Although a bit unclear from the record, Lundquist at times used the handicap parking spaces adjacent to her place of employment, but other times encountered instances where all such handicap spots were full when she arrived. (Id. at p.9, ¶ 8-10).

2

On March 10 and 11, 2008, Lundquist encountered displays of graduate students' placards or posters within the Wagner Center that reduced hall space. (Id. at p.9-10, ¶ 12-13). Lundquist was concerned about tripping over one of the signs. (Doc. 23-1 at p.14 of 40). Lundquist was frustrated that neither Kristen Blaschke, Lundquist's supervisor, nor Struck was responsive to her concerns about these poster displays. Lundquist therefore contacted the fire marshal about these displays impeding entry to, and egress from, the Wagner Center. (Doc. 24 at p.10, ¶ 14-16). On March 17, 2008, Blaschke reprimanded Lundquist for calling the fire marshal, rather than addressing the matter internally. (Id. at p.10-11, ¶ 17-18). Lundquist felt that this reprimand was entirely inappropriate.

Lundquist had her annual review scheduled for April 22, 2008. On that day, prior to the annual review, Lundquist sent an email to Blaschke raising concerns about the availability of accessible parking spaces for employees. (Id. at p.3, ¶ 11). Lundquist referred to her November of 2007 email message to Garaets. Lundquist stated: "Since then, I have had issues finding places to park when arriving at work, and have emails documenting some of the more difficult days." Lundquist stated that this was her "written request to you as my supervisor, to assist for me in my quest for a reserved accessible parking spot for me in the Sanford parking area." (Id. at p.3, ¶ 11). Lundquist further stated that she would provide any "justification for this accommodation" and noted that she had "no objections to following the 'proper procedure' for this concern." (Id. at p.3, ¶ 12). Blaschke forwarded this April 22 email from Lundquist to Judy Struck. (Id. at p.3, ¶ 13). Blaschke completed Lundquist's annual review on April 22, 2008. Lundquist received positive comments in all categories of review. (Id. at p.3, ¶ 14).

Lundquist's request for a designated parking spot was forwarded to Ermetta Fox, the director of disability services for The University of South Dakota ("USD"). USD required individuals to register as an employee with a disability, so that USD could determine whether the individual qualified as disabled under the ADA and so that USD could then engage in the interactive process contemplated by the ADA. Blaschke informed Lundquist that the USD Human Resources Office required her to register with Disability Services to entertain her request for a designated parking spot. (Id. at p.3, ¶ 15). Fox also advised Lundquist of the registration process; Lundquist understood that the registration process would "put her on the radar." (Id. at

p.3, ¶ 16-17). Lundquist continued to park as she had in the past, which included parking at times in the handicap-reserved spots next to her place of employment. (Id. at p.3, ¶ 16-17). Because both Fox and Lundquist worked for the Center for Disabilities, Fox recused herself from the process and advised Lundquist that her request would be handled by someone else. (Id. at p.3, ¶ 18).

After Fox recused herself, Lisa Sorensen, the director of Human Resources for USD Sanford School of Medicine, became responsible for handling the registration forms. On May 9, 2008, Blaschke told Lundquist that she needed to complete the registration form to pursue her request for a designated handicap-accessible parking spot. (Id. at p.11, ¶ 20). Lundquist testified that twelve days then passed before she received the registration forms. (Id. at p.11, ¶ 21). Lundquist did not receive the registration forms until after she requested them. (Id. at p.3, ¶ 19). The registration forms received by Lundquist included a Health Care Provider Certification questionnaire for a physician to complete regarding Lundquist's physical limitations. (Id. at p.3, ¶ 19; Doc. 20-3 at p.1-4). Accompanying that form was a Release of Information by which Lundquist would grant the "above mentioned physician/facility release information to or exchange information with Human Resources at The University of South Dakota in regards to my request for workplace accommodations." (Doc. 24 at p.4, ¶ 19; Doc. 20-3 at p.5). The Release of Information form had space for Lundquist to fill in the name and address of a single provider. (Doc. 20-3 at p.5).

On May 19, 2008, Lundquist sent an email to Blaschke posing questions regarding the need for medical documentation and information in the registration form. Lundquist stated that she had six physicians that dealt with her mobility issues and that she did not want to incur the cost of scheduling an appointment with each of them to complete the form. Lundquist also questioned whether USD was entitled to receive requested medical information. (Doc. 24 at p.5, ¶ 20). Blaschke asked Lundquist to direct those questions to Sorensen, which Lundquist then did. (Id. at p.5, ¶ 21). Sorensen responded to Lundquist by email noting that USD Sanford School of Medicine "cannot a[ss]ess what may be needed as a reasonable accommodation"

without Lundquist having completed the form. (Id. at p.5, ¶ 22). Lundquist was concerned[2] about her employer accessing her complete medical history, which contained not only information about physical limitations, but also, as became clear during the hearing, certain psychological records understandably sensitive to Lundquist. (Id. at p.5, ¶ 22).

Sorensen offered to meet with Lundquist to review the registration forms, and Lundquist accepted. Lundquist had Charlene Hays of South Dakota Advocacy Services attend the meeting, which occurred on June 11, 2008. (Id. at p.5, ¶ 24, and p.12, ¶ 23). After going over the forms, Lundquist and Hayes told Sorensen that Lundquist would provide USD Sanford School of Medicine with the requested medical information regarding her disability within ten days to enable USD Sanford School of Medicine to consider the request for a reserved parking spot. (Id. at p.5, ¶ 25). During her deposition, however, Lundquist testified that when she left the meeting, Lundquist had no intention of providing the medical documentation in support of her request and had already decided to file a complaint with the Equal Employment Opportunity Commission ("EEOC") prior to the meeting. (Id. at p.6, ¶ 26). Lundquist accordingly did not complete the registration forms or provide USD Sanford School of Medicine with any of the requested medical documentation. (Id. at p.6, ¶ 27).

On July 2, 2008, Lundquist filed a charge of discrimination against USD Sanford School of Medicine with the South Dakota Division of Human Rights. (Id. at p.6, ¶ 28). After Lundquist filed the charge of discrimination, USD Sanford School of Medicine moved Lundquist to the front desk to answer phones and gave her "more responsibility than what she was already performing." (Id. at p.6, ¶ 29). Lundquist testified that after her charge of discrimination "became public," Blaschke was "short" with her. (Id. at p.6, ¶ 30).

On Thursday, July 18, 2008, Lundquist, while working past her scheduled quit time of 4:30 p.m., sent an email message to Blaschke regarding a question Lundquist had on a project. (Id. at p.6, ¶ 31). Blaschke responded the following morning, noting that the time reflected on Lundquist's email message showed Lundquist to have been working past her scheduled quit time.

---

[2]This concern seems unjustified in that the Release of Information form is attached to the Health Care Provider Certification questionnaire and has space to list just the name and address of the provider answering the questions regarding Lundquist's physical disability. (Doc. 20-3).

5

Blaschke asked Lundquist to correct her time sheet, which showed a 4:30 p.m. departure time for July 18, and reminded Lundquist of the policy of USD Sanford School of Medicine requiring staff to obtain permission from a supervisor before working overtime. (Id. at p.6-7, ¶ 32). Lundquist responded to Blaschke by email message later that morning, stating that she understood the policy and would correct her time sheet. Lundquist also noted that it was her first week working at the front desk, which involved additional responsibilities. (Id. at p.7, ¶ 33). Blaschke replied by thanking Lundquist for making the correction. (Id. at p.7, ¶ 34).

Lundquist testified that Blaschke's email asking her to correct her time sheet was the "straw that broke the camel's back." (Id. at p.7, ¶ 35). The next Monday, Lundquist visited her psychiatrist, who, after listening to Lundquist, suggested that she consider quitting her job. (Id. at p.7, ¶ 36). Lundquist resigned from USD Sanford School of Medicine on July 24, 2008, sending a resignation letter stating that she was resigning at the advice of her physician due to medical reasons. (Id. at p.7, ¶ 37). Lundquist's letter expressed an appreciation for Struck and Blaschke and for the opportunities that she had received through employment at USD Sanford School of Medicine. (Id. at p.7, ¶ 37).

The South Dakota Division of Human Rights on November 25, 2008, issued a determination of no probable cause on Lundquist's charge of discrimination, together with findings of fact, analysis and determination. (Id. at p.7, ¶ 38). Lundquist requested a substantial weight review from the EEOC. The EEOC adopted the findings of the South Dakota Division of Human Rights and issued Lundquist a right to sue letter on July 13, 2009. (Id. at p.7, ¶ 40).

## II. Discussion

### A. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law." Summary judgment is not "a disfavored procedural shortcut, but rather...an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Rule 1 of the Federal Rules of Civil Procedure). On summary judgment, the evidence is "viewed in the light most favorable to the

non-moving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is generally disputed. Fed. R. Civ. P. 56(c)(1); Adam v. Stonebridge Life Ins. Co., 612 F.3d 967, 971 (8th Cir. 2010).

Lundquist maintains that summary judgment is rarely appropriate in employment discrimination cases. However, the United States Court of Appeals for the Eighth Circuit this year stated:

> The panel statements asserting a different standard of review for summary judgment in employment discrimination cases are contrary to Supreme Court precedent. The Court has reiterated that district courts should not treat discrimination differently from other ultimate questions of fact ... Because summary judgment is not disfavored and is designed for every action, panel statements to the contrary are unauthorized and should not be followed. There is no discrimination case exception to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial.

Torgeson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (internal marks and citations omitted). Of course, cases alleging employment discrimination or violation of the ADA sometimes involve two irreconcilable versions of the core facts and thus material disputes of fact making summary judgment improper. In this case, even resolving all such fact disputes for Lundquist, summary judgment is appropriate.

### B. Wrong Party Defendant

Lundquist sued her employer USD Sanford School of Medicine. USD Sanford School of Medicine, as its first ground for summary judgment, maintains that it does not have the capacity to sue or be sued under South Dakota law. Rule 17(b)(3) of The Federal Rules of Civil Procedure provides that the capacity of an entity like USD Sanford School of Medicine to sue and be sued is determined "by the law of the state where the court is located."

USD Sanford School of Medicine is a creation of the South Dakota legislature. Under the South Dakota Constitution, the South Dakota legislature "shall direct by law in what manner and in what courts suits may be brought against the state." S.D. Const. Art. II § 27. The South

Dakota legislature established USD and the School of Medicine there and placed USD and its medical school under the control of the South Dakota Board of Regents. S.D.C.L. 13-57-1. Nothing in S.D.C.L. 13-57 gives USD or its medical school the ability to sue or be sued. Rather, the Board of Regents, which controls USD Sanford School of Medicine, has the power to sue and be sued under S.D.C.L. 13-49-11.

In a substantially similar case, Chief Judge Karen E. Schreier recently reached the same conclusion with respect to South Dakota State University ("SDSU"). Pushkin v. South Dakota State University, 2010 WL 5089480 (Dec. 8, 2010). SDSU exists under S.D.C.L. 13-58, which is similar to S.D.C.L. 13-57, which governs USD and its medical school.

Lundquist does not take issue with the Pushkin decision. Instead, Lundquist, after learning of the Pushkin decision, started a separate lawsuit with nearly identical allegations against the South Dakota Board of Regents. See Lundquist v. South Dakota Board of Regents, CIV 11-4098-RAL. Lundquist moved for joinder, or more appropriately consolidation, of this case with the separate case brought against the South Dakota Board of Regents. See Sierra v. McGuinness, 2011 WL 332426 (E.D. Cal. 2011); 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2382 (3d ed.).

Alternatively, Lundquist argues that USD Sanford Medical School, unlike SDSU in Pushkin, is a partnership between USD and Sanford Health, a Sioux Falls-based regional health care system. Lundquist's primary evidence for a partnership is the use of the word "Sanford" in the name of USD Sanford Medical School and the control over parking outside the Wagner Center by Sanford Health. Lundquist suggests that USD Sanford School of Medicine holds itself out to be a partnership between USD and Sanford Health and that service on USD as one of the partners is sufficient to bring suit against such an alleged partnership. At the October 7, 2010 hearing, neither party provided the Court with a definitive answer or further information concerning the alleged partnership between USD Sanford School of Medicine and Sanford Health; Lundquist had conducted no discovery on the issue. At the hearing, both parties agreed that the Court could take judicial notice of public information regarding whether USD Sanford Medical School and Sanford Health constitute a legal partnership.

Under Federal Rule of Evidence 201(b), "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Am. Prairie Const. Co. v. Hoich, 560 F.3d 780, 796-97 (8th Cir. 2009) (quoting Fed. R. Evid. 201). In today's world, an entity's official website often reveals what the entity holds itself out as being and what the entity claims its history to be. According to the website of USD Sanford School of Medicine, USD dates back to 1862, when it was established by the Dakota Legislature at Vermillion, although it began classes at a later time. The medical school at USD started in 1907. The Sanford name became affiliated with USD's medical school in 2005 or 2006[3], after philanthropist T. Denny Sanford pledged $20,000,000 to the school. USD Sanford School of Medicine About Us Page, www.usd.edu/medical-school/about-us.cfm (last visited October 31, 2011). As set forth in the website, USD Sanford School of Medicine "remain[s] an entity of USD but closely collaborate[s] with Sanford Health as well as the rest of our partners - Avera Health, Regional Health, and the Veterans Administration." Id.

The Sanford name is attached to USD Sanford School of Medicine as a result of a gift from philanthropist T. Denny Sanford. See http://www.usd.edu/press/news/news.cfm?nid=682 (last visited October 31, 2011). Under Rule 201(b), this Court can take judicial notice of facts not subject to reasonable dispute in that they are "generally known within the territorial jurisdiction of the trial court." In South Dakota, it is well known and not subject to any dispute that Sanford's wealth primarily came from ownership of First PREMIER Bank and PREMIER Bank Card and that Sanford gave a similar gift to what was known as Sioux Valley Hospital, prompting that hospital to change its name ultimately to Sanford Health. See Sanford Building National Name, Argus Leader, September 7, 2011, available at 2011 WLNR 18446653. The generosity of Sanford to both the health system and to USD's medical school does not unite the health system and USD in a legal partnership. Indeed, the website of USD Sanford School of Medicine makes clear that it considers its "partners"—a term clearly not used in a legal sense on

---

[3]The USD Sanford School of Medicine website variously reports the year of the gift as 2005 and 2006.

9

the website—as including Avera Health, the primary competitor of Sanford Health; Regional Health, headquartered in Rapid City and not affiliated with Sanford Health; Sanford Health; and the Veterans Administration, more properly known as the Royal C. Johnson Veterans Memorial Medical Center, which is controlled by the United States Department of Veteran Affairs in Sioux Falls. Lundquist's argument that USD Sanford School of Medicine holds itself out as a legal partnership between USD and Sanford Health is not accurate.[4]

In short, summary judgment is appropriate because USD Sanford School of Medicine does not have the capacity to sue or be sued. Rather, Lundquist should have named —as she sought to do in a subsequent case—the South Dakota Board of Regents as the appropriate defendant in this case.[5] Because there exists a separate case against the South Dakota Board of Regents and because both parties have briefed fully Defendant's Motion for Summary Judgment, this Court turns to the question of whether summary judgment on the merits of the case should enter.

### C. Lundquist's Claim Under the ADA

Lundquist contends that USD Sanford School of Medicine engaged in "discriminatory activity" that violated the ADA when USD Sanford School of Medicine failed to provide her with an assigned disability-accessible parking spot and with adequate access to the building. When considering a reasonable accommodation claim such as Lundquist's, courts within the Eighth Circuit are to apply a modified burden-shifting analysis. See Fenney v. Dakota, Minn. & E. R. Co., 327 F.3d 707, 712 (8th Cir. 2003) (citing Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995)); see also Peebles v. Potter, 354 F.3d 761, 766 (8th Cir. 2004)

---

[4] A second problem exists with Lundquist's argument that service on USD should be sufficient due to the alleged partnership between USD and Sanford Health creating USD Sanford School of Medicine. This Court today is releasing an opinion and order in the related case of Lundquist v. South Dakota Board of Regents, 11-cv-4098-RAL. For reasons explained in that opinion and order, Lundquist failed to properly serve the entity to which the South Dakota Legislature has granted control of USD and the capacity to sue and be sued. See Fed.R.Civ.P. 4(j)(2); S.D.C.L. 15-6-4(d)(5).

[5] Lundquist also could have sought to substitute the South Dakota Board of Regents as a party defendant by stipulation with USD Sanford School of Medicine. There is no indication in the record that Lundquist sought to do so.

("Reasonable accommodation claims are not evaluated under the McDonnell Douglas burden-shifting analysis. Rather, 'a modified burden-shifting analysis' is applied.") (quoting Fenney, 327 F.3d at 712). To establish a prima facie case in a reasonable accommodation claim under the ADA, Lundquist must show she "(1) has a disability within the meaning of the ADA, (2) is a qualified individual, and (3) suffered an adverse employment action as a result of the disability." Huber v. Wal-Mart Stores, Inc., 486 F.3d 480, 482 (8th Cir. 2007). To be a "qualified individual" within the meaning of the ADA, Lundquist must "(1) possess the requisite skill, education, experience, and training for her position; and (2) be able to perform the essential job functions, with or without a reasonable accommodation." Id. Lundquist has a disability and is a qualified individual. The undisputed material facts, however, do not show any "adverse employment action" as a result of Lundquist's disability.

USD Sanford School of Medicine contends that Lundquist cannot establish a prima facie reasonable accommodation claim because she failed to engage in the interactive process as required by the ADA. The ADA requires an employer to reasonably accommodate an employee's disability and engage in an interactive process to identify potential accommodations that could overcome her limitations. Burchett v. Target Corp., 340 F.3d 510, 517 (8th Cir. 2003); See also Peyton v. Fred's Stores of Arkansas, 561 F.3d 900, 902 (8th Cir. 2009) ("To determine whether an accommodation for the employee is necessary, and if so, what that accommodation might be, it is necessary for the employer and employee to engage in an 'interactive process.'") (citation omitted). "The employer and the employee must work together in good faith to help each other determine what accommodation is necessary." Cannice v. Northwest Bank Iowa, 189 F.3d 723, 727 (8th Cir. 1999). "An employee has a duty to cooperate with an employer's reasonable accommodation efforts by explaining the disability and qualifications." Henry H. Perritt, Jr., Americans with Disabilities Act Handbook (4th ed. 2003).

Lundquist's failure to fill out the registration form or provide her employer with the necessary documentation was contrary to the interactive process. Lundquist thus cannot show that USD Sanford School of Medicine did not provide her with reasonable accommodations. Lundquist asked for her own designated handicap-reserved parking space because of certain mobility issues she has. (Doc. 23-6). Pursuant to its policy, USD Sanford School of Medicine

11

informed Lundquist that she needed to fill out a registration form for disability services as a precursor to addressing her accommodation request. (Doc. 23-7). The registration form included a release of information, which provided that the undersigned granted "the above mentioned physician/facility release information to or exchange information with Human Resources at The University of South Dakota in regards to my request for workplace accommodations." (Doc. 20-3). Following her receipt of the registration form, Lundquist emailed USD Sanford School of Medicine with a number of questions about it. (Doc. 20-8). USD Sanford School of Medicine responded to these questions, explained to Lundquist that she needed to fill out the registration form to allow USD Sanford School of Medicine to determine what may be a reasonable accommodation, and offered to meet with Lundquist to discuss the form. (Doc. 20-8). On June 11, 2008, Lundquist met with USD Sanford School of Medicine to discuss the registration form. (Doc. 24 at p. 5, ¶ 24, and p.12, ¶ 23). During the meeting, Lundquist told USD Sanford School of Medicine that she would fill out the registration form, even though she had decided already not to do so. (Doc. 19-2 at 4). Lundquist neither filled out the registration form nor provided USD Sanford School of Medicine with any of the medical documentation requested. (Doc. 24 at p.6, ¶ 27).

Lundquist's case is similar to two cases-Beck v. University of Wisconsin Bd. of Regents, 75 F.3d 1130 (7th Cir. 1996) and Templeton v. Neodata Servs, Inc., 162 F.3d 617 (10th Cir. 1998)-in which courts of appeals have affirmed grants of summary judgment. Beck involved a disabled employee who brought a claim under the ADA against her employer for failing to provide reasonable accommodations for her disability. After the employee in Beck supplied her employer with a letter from her doctor stating that she "may require some reasonable accommodation so that she does not have a recurrence of this condition [depression]," the employer requested that the employee sign a release to allow it to obtain further information. Beck, 75 F.3d at 1133. Rather than signing the release, however, the employee brought suit against her employer. Id. at 1135. The Seventh Circuit in Beck held that, by refusing to sign the medical release form or provide her employer with sufficient information about her medical conditions the plaintiff was responsible for the breakdown in the interactive process envisioned

12

by the ADA and thus could not prevail on her ADA claim as a matter of law. In so finding, the court explained:

> [N]either party should be able to cause a breakdown in the [interactive] process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility. For example, the cause of the breakdown might be missing information.

Id. at 1135. The Seventh Circuit in Beck emphasized that where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process. Id. at 1136; see also Steffes v. Stepan, 144 F.3d 1070, 1073 (7th Cir. 1998) (noting that when the employee fails to "hold up her end of the interactive process by clarifying the extent of her medical restrictions, [the employer] cannot be held liable for failing to provide reasonable accommodations.").

The United States Court of Appeals for the Tenth Circuit faced a similar case in Templeton. In Templeton, the plaintiff refused to authorize her physician to release the medical information requested by her employer because she believed that her employer was preparing to place her on medical leave against her wishes. Templeton, 162 F.3d at 618. The plaintiff in Templeton refused to cooperate with further requests for information as well. Id. at 619. The Tenth Circuit affirmed the district court's grant of summary judgment for the employer and its finding that the plaintiff was properly terminated for failing to provide medical information that was reasonably requested by her employer, not for any reason remediable under the ADA. Id. at 619. "[T]he employee's failure to provide medical information necessary to the interactive process precludes her from claiming that the employer violated the ADA by failing to provide reasonable accommodation." Id. Lundquist's failure to complete the forms to provide

13

information to her employer regarding her disability was a failure to participate in the interactive process and thus precludes her from claiming that USD Sanford School of Medicine violated the ADA by failing to provide the requested accommodation.

### D. Lundquist's retaliation and constructive discharge claims

The anti-retaliation provision of the ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). Lundquist alleges that USD Sanford School of Medicine retaliated against her because she called the fire marshal about certain obstructions temporarily placed at the Wagner Center, complained about parking, and filed a charge of discrimination with the South Dakota Division of Human Rights. Where, as here, there is no direct evidence of retaliation, the Court analyzes Lundquist's retaliation claim under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See Stewart v. Indep.Sch. Dist. No. 196, 481 F.3d 1034, 1042-43 (8th Cir. 2007); Thomas v. Corwin, 483 F.3d 516, 530 (8th Cir. 2007) ("Because [the plaintiff] presented no direct evidence of retaliation, we analyze her claim pursuant to the McDonnell Douglas burden-shifting analysis."). Under this framework, Lundquist must establish a prima facie case of retaliation by showing that: (1) she engaged in statutorily protected activity; (2) an adverse employment action was taken against her; and (3) a connection exists between the two events. Id.

Even if Lundquist was engaged in statutorily protected activity, no evidence exists that USD Sanford School of Medicine took "an adverse employment action" against her. An adverse employment action is a "material employment disadvantage." Sallis v. Univ. of Minn., 408 F.3d 470, 476 (8th Cir. 2005). "Traditional examples of adverse actions include termination, reduction in pay or benefits, or significant changes that affect an employee's future career prospects." Jelsma, 744 F. Supp. 2d at 1010.

Here, Lundquist resigned on July 24, 2008. Lundquist claims that she suffered an adverse employment action in the form of being constructively discharged. "A plaintiff claiming constructive discharge must show that a reasonable person would have found the conditions of

14

employment intolerable and that the employer either intended to force the employee to resign or could have reasonably foreseen that the employee would do so as a result of its actions." Fenney v. Dakota, Minn. & E. R. Co., 327 F.3d 707, 717 (8th Cir. 2003) (citation omitted). "This burden is substantial as the bar is quite high in constructive discharge cases." O'Brien v. Dep't of Ag., 532 F.3d 805, 810-11 (2008). "Whether working conditions are sufficiently objectionable to support a constructive discharge claim is determined by an objective standard, not the employee's subjective feelings." Meyers v. Nebraska Health and Human Services, 324 F.3d 655, 660 (8th Cir. 2003). "[A]n employee may not be unreasonably sensitive to his working environment." Thompson v. Bi-State Development Agency, 463 F.3d 821, 825 (8th Cir. 2006). An employee should not "assume the worst" and jump to conclusions too quickly. Id. "An employee who quits without giving his employer a reasonable chance to work out a problem is not constructively discharged." Id. Moreover, a constructive discharge claim "requires considerably more proof than an unpleasant and unprofessional environment." Jones v. Fitzgerald, 285 F.3d 705, 716 (8th Cir. 2002). A working atmosphere may not be ideal, but "a feeling of being unfairly criticized or having to endure difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Lopez v. City of Brookings, 489 F. Supp. 2d 971, 978 (D.S.D. 2007).

  The undisputed material facts reveal that Lundquist was not constructively discharged. After Lundquist complained about parking and called the fire marshal about the placement of certain placards or posters, Lundquist underwent a job evaluation that was all positive. The job evaluation was done by the same supervisor whom Lundquist said was upset with her over the call to the fire marshal.

  After making the charge of discrimination, Lundquist was transferred to a front desk position, which involved more responsibility. Lundquist thought her supervisor was colder to her after she filed the charge of discrimination. Lundquist characterized an exchange of email messages that she had with her supervisor as the "straw that broke the camel's back." Viewed objectively, those email messages, concerning Lundquist needing prior permission to work overtime, were professional and courteous in tone. Lundquist notes that her psychiatrist told her to quit her job. That psychiatrist, however, was unfamiliar with the working conditions at USD

Sanford School of Medicine other than what was related by Lundquist. Viewing the facts in the light most favorable to Lundquist, this Court concludes as a matter of law that Lundquist's working conditions were not "so intolerable as to compel a reasonable person to resign," and that USD Sanford School of Medicine neither intended nor could reasonably foresee that Lundquist would quit. Lundquist's resignation letter furthermore belies her assertion that she was constructively discharged.

## IV. Conclusion

For the reasons contained in this Opinion and Order, it is hereby

ORDERED that Plaintiff's Motion for Joinder (Doc. 28) is denied, both because summary judgment is appropriate for the wrong party being sued here and because summary judgment is appropriate on the merits of the case. It is further

ORDERED that Defendant's Motion for Summary Judgment (Doc. 16) is granted.

Dated November 4, 2011.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE